In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00001-CV**
_____

**IN THE INTEREST OF B.C.C.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-224,292-C**

**MEMORANDUM OPINION**

This is an appeal of a SAPCR ("Suit Affecting Parent-Child Relationship"). After a bench trial, pro se Appellant Father[1] appeals a modification order entered by the trial court with respect to his son B.C.C.[2] The modification order appoints a parenting facilitator, increases Father's child support, and orders an amount to be

---

[1] Father is pro se on appeal, but he was represented by an attorney in the trial court.

[2] To protect the privacy of the parties, we use the child's initials and refer to certain other individuals by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d).

paid retroactively.[3] In three issues Father argues the trial court abused its discretion in improperly delegating possession and access determinations to the parenting facilitator, the trial court abused its discretion in finding that a substantial and material change of conditions existed warranting modification of the prior SAPCR order, and the trial court's award of current and retroactive child support was an abuse of discretion because Mother, in an attempt to show a material and substantial change in circumstances, failed to introduce any evidence of the circumstances at the time of the initial order. Finding no abuse of discretion, we affirm the trial court's order.

## Procedural Background

B.C.C. was born in 2014, and his parents ("Mother" and "Father") never married. In 2016, the trial court signed an Order in Suit Affecting the Parent-Child Relationship appointing Mother and Father joint Managing Conservators of B.C.C., including a standard possession order, naming Mother as the parent with the right to designate B.C.C.'s primary residence, and ordering Father to pay $328.40 per month in child support. On September 18, 2018, the trial court signed an Order in Suit to Modify Parent-Child Relationship that ordered Father to pay $93 per month "for reimbursement of health insurance premiums, as child support[.]"

---

[3] We address only those portions of the modification order relevant to the issues on appeal.

2

On May 28, 2019, Mother filed a Petition to Modify seeking another modification of the order signed on September 18, 2018. Mother alleged that "[t]he circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed" since the date of the prior order and that modification was in the child's best interest. Mother requested that the trial court appoint a parenting facilitator because the case "is a high-conflict case." Mother also requested the terms and conditions for access to or possession of the child be modified asking the trial court to order specific pick up and return times for the child during the school year, order that Father not go to the child's school except to pick up and return the child for his visitation, order that Father not have the police go with him or meet Mother for visitation pick up and return, order Father have an appropriate car seat for the child, order Father to stop harassing behavior toward Mother, order Father to submit to random drug testing, order Father to notify Mother and the trial court of contact information for all of his roommates, and requested that Father's elderly grandparents not babysit the child. Mother requested temporary orders including that the trial court deny Father extended summer visitation with the child, order the psychological evaluation of Father and the child, and appoint a parenting facilitator. Mother also requested a temporary restraining order to temporarily enjoin Father from disturbing the peace of the child or of another party, withdrawing the child from enrollment in school or daycare facility where the child

3

is enrolled, hiding the child from Mother, or making disparaging remarks about Mother or her family in the child's presence or within the child's hearing or on social media. Mother also filed a Motion for Psychological Examination and/or Visitation Evaluation.

In her affidavit executed on May 23, 2019, and attached to the Petition to Modify, Mother stated, in relevant part, that Father frequently gets B.C.C. to school late, picks him up late, often calls the police for the exchange of B.C.C. between parents, and that B.C.C. is distressed about the police coming to the house. Mother stated that Father filed criminal charges for assault against her in the prior year, and she was found not guilty of the offense after a trial. According to Mother, Father acted erratically at the trial, "caused a scene[,]" and scares her. Mother explained that before she graduated from the police academy, Father approached the academy and tried to get her kicked out. She stated that Father disrupts B.C.C.'s schooling by showing up at the daycare at times during the day other than his pickup and return times. According to the affidavit, Father allowed the child to ride in a car without a car seat, Mother suspects B.C.C. will not be with Father during Father's entire 30-day summer visitation period but will instead be with Father's elderly grandparents who have mobility issues and Mother stated she had seen the grandparents at her criminal trial in May 2019, Mother fears that Father is using drugs "again[]", Father refuses to tell Mother who his roommates are, and she wants Father to be ordered to

4

submit to psychological testing prior to Father exercising his extended summer possession of B.C.C. to determine Father's ability to properly parent B.C.C. for extended periods of time.

The trial court entered a temporary restraining order against Father as requested by Mother and set a date for a hearing on whether a parenting facilitator should be appointed and whether the court should order a psychological evaluation of Father and of B.C.C. The trial court set a hearing for June 11, 2019, and after the hearing the trial court signed an Order Appointing Psychologist for Visitation Evaluation to evaluate Father and give an opinion to the court about what possession and access should be ordered for Father. The same day, the trial court signed an order suspending Father's extended summer possession of B.C.C.

Father filed a general denial answer. After the parties submitted to a hair follicle test and Father tested positive for amphetamines and marijuana on June 11, 2019, Mother filed a Motion to Modify Temporary Orders seeking to modify Father's visitation to restricted supervised visitation. On August 9, 2019, after a hearing, the trial court signed Temporary Orders ordering that: Father have possession of B.C.C. on the 2nd, 3rd and 4th Saturday of each month beginning at 9 a.m. and ending at 6 p.m. and Mother have possession of B.C.C. at all other times; Father must pick up and return B.C.C. to the front door of Mother's residence; Father may not have the police at the exchanges of B.C.C.; Mother can have Father drug

tested no more than once a week at her expense and at the location designated in the order; if Father fails to submit to testing, his visitation is suspended until he provides Mother with a clean drug screen at his expense; Mother and Father are required to communicate only through Our Family Wizard; the June 11, 2019 Supplemental Temporary Order shall remain in force and effect; the provisions regarding health care in the September 18, 2018 Order in Suit to Modify Parent-Child Relationship shall remain in force and effect; and the provisions regarding conservatorship and child support in the February 2, 2016 Order in Suit Affecting the Parent-Child Relationship shall remain in force and effect.

In Mother's Second-Amended Petition to Modify Parent-Child Relationship—the live petition at the time the court entered the modification order at issue in this appeal—Mother alleged that circumstances had materially and substantially changed since the date of the rendition of the order to be modified, and that the support payments previously ordered should be increased until B.C.C. is eighteen years old. Mother requested that the terms of Father's access or possession of B.C.C. be changed to "[r]estricted, supervised visitation, with no overnight visitation." Mother also requested that the court appoint a parenting facilitator to assist with resolving future conflicts.

A report from Eryn M. Lucas, the psychologist appointed to evaluate Mother, Father, and B.C.C. in this case, was filed in December 2019 with the trial court. The

report stated that it represented "the Custody Evaluation of [Father] and [Mother], in the interest of [B.C.C.] conducted from July 29, 2019 to November 8, 2019." Dr. Lucas noted in her report that Mother reported that B.C.C.'s behavior has improved with less time with Father, Mother had seen marijuana at Father's home, Mother reported that B.C.C. smells of marijuana after having been with Father, and Father had involved the police on numerous occasions due to interactions between Mother and Father. Dr. Lucas's report noted that Father reported that Mother threatened to murder him, and Father stated that Mother's allegation that he is late to visitation exchanges is false. Lucas's report stated that Mother and Father had been "in ongoing litigation since their August 2018 modification[]" and that Father had "filed regarding child support, insurance coverage, criminal charges, and a motion of enforcement." Dr. Lucas wrote that in early 2019, Father called Mother because he could not control B.C.C., and Father asked Mother to tell B.C.C. to obey Father. The report described an incident in March 2019 when Father came to pick up B.C.C. but B.C.C. began to scream when Father picked him up and "[p]olice were reportedly called" to diffuse the situation. The report also stated that since December 2018, Father had repeatedly called the police to Mother's home for custody exchanges because Father felt threatened. According to the report, Father failed two drug tests on June 11 and July 9.[4] Dr. Lucas wrote that Father reported having issues with child

_____

[4] The report did not specify the year.

7

visitation from 2017 to 2019 and that Mother threatened him by phone about a month and a half after the 2018 modification order was rendered, and Father reported that Mother threatened to murder Father on September 10, 2018. The report noted that Father was seeing a counselor by the name of Christy Mellen. The report further noted that Father had received an email from Mother's attorney on September 3, 2019 stating that Father had been having lunch with B.C.C. at daycare, which is a type of visitation not allowed by the previous order.

Evidence at Hearing on September 8, 2020

<u>Testimony of Officer Kirk Smith</u>

Kirk Smith, an officer with the Beaumont Police Department, recalled that the Department received a call from Father late in 2019 related to picking up a child, and Smith went to Mother's house for the exchange of the child. According to Smith, Father wanted to file a report against Mother for interference with child custody. Smith testified that, he told Father that the police were not going to be able to have the child removed from one party to another and that Father had forfeited the rest of his visitation time, and Father looked upset and agitated because he did not get what he wanted. Smith agreed that he told Dr. Eryn Lucas about this event. On cross-examination, Smith recalled that at the time of the incident, Mother told him that she did not feel comfortable giving the child to Father even though it was Father's weekend to have the child.

Testimony of Jimmy LeBouef

Jimmy LeBouef testified that Mother had attended the Lamar Institute of Technology ("LIT") Regional Police Academy, where LeBouef served as director. LeBouef recalled that when Mother was enrolled, Father came to the main office to inform him that Father had filed criminal charges against Mother and that Father did not understand why Mother was still in the academy. LeBouef testified that he told Father that he would not discuss any of Mother's scholastic or personal information. LeBouef also testified that he reported the incident to his supervision and to the LIT University police. LeBouef recalled telling Dr. Eryn Lucas that Father had no legitimate reason to be at the LIT police academy and it seemed like Father just wanted to get Mother kicked out of the academy. LeBouef also agreed that the academy considered filing a no-trespass warning against Father so he would not come back. On cross-examination, LeBouef agreed that, on the day Father went to the academy, he did not shout or appear violent, but he seemed to be there "to cause an issue [and] he had no reason to be [t]here in the first place."

Testimony of Dr. Eryn Lucas

Dr. Eryn Lucas agreed that she was appointed to do a psychological evaluation of the parties in this case for the purpose of determining what kind of visitation Father should have with B.C.C. Lucas testified that she saw Mother and Father two times, and the second time she saw Father was for her to observe Father interacting

9

with B.C.C. Lucas recalled that she took Mother back with the child first because Father was late, and Father was upset when he arrived because "[M]other got to go back with the child first." Lucas testified that Father was anxious and trying to control the session. According to Lucas, there were several occasions when B.C.C. did not answer the questions as Father wanted and Father lifted his shirt to show B.C.C. his belt and "basically threatened to give him a spanking[.]"

A report from Eryn M. Lucas was filed in December 2019 with the trial court, and it appears in the clerk's record. The report stated that it represented "the Custody Evaluation of [Father] and [Mother], in the interest of [B.C.C.] conducted from July 29, 2019 to November 8, 2019." The attorneys for both parties examined Lucas in the hearing and referenced pages 9, 10, 16, 20, 22, 25, 26, and 27 of Lucas's evaluation report. Neither party marked or introduced a copy of Dr. Lucas's report into evidence during the final hearing, but the evaluation was ordered by the court, the report was filed with the trial court upon completion, and it was in the court's file at the time of the hearing. A trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that the trial court judicially knows. *See In re A.M.*, No. 09-19-00075-CV, 2019 Tex. App. LEXIS 7941, at \*\*46-47 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.) (citing *Gardner v. Martin*, 345 S.W.2d 274, 276 (Tex. 1961); *In re J.R.*, No. 02-18-00317-CV, 2019 Tex. App. LEXIS 339, at \*23 n.16

10

(Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op.); *In re K.F.*, 402 S.W.3d 497, 505 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)).

Lucas testified at the hearing that in the report she sent to the trial court, she had stated that Father was likely to react without taking time to think through the consequences and Father could benefit from better parenting skills, and she recommended Father have a medication evaluation with a psychiatrist to see if psychotropic medication would be helpful. She also testified that Father's test results showed "there were likely some psychotic tendencies[]" and "psychotic confusion[,]" which could be scattered and unclear thoughts, unreasonable judgments and decision making, or hallucinations or delusions. She also testified that during her sessions with Father, she observed that at times he refused to make eye contact, became demanding and frustrated, and behaved oddly. Lucas also agreed that a parenting facilitator would be beneficial because of communication problems between Father, Mother, and Mother's boyfriend.

On cross-examination, Lucas agreed that Mother's test results reflected that Mother tended to "overvalue her personal worth and become preoccupied with her own needs even at the expense of others[.]" Lucas agreed that Father and B.C.C. are "bonded and close emotionally[,]" but she stated that Father's behavior with B.C.C. was "confusing[.]" Lucas testified that Mother and Father were not "communicating and coordinating anything, which [] is part of the reason why [] they need parenting

11

facilitation." Lucas agreed that she recommended that Father's visitation increase as Father shows improvement in interactions, consistency, parenting, and negative drug test results.

Testimony of Mother

Mother testified that her complaints about Father are about events that have occurred since September 18, 2018. Mother testified that Father had not been picking up B.C.C. at her front door as court-ordered since July 9, 2019. According to Mother, when Father came to pick up B.C.C., Father knocked on the door, then backed up about twenty feet or close to the road. Mother testified that because, at age six, B.C.C. is "very mobile[,]" it would be better for Father to take B.C.C. by the hand and walk B.C.C. to the car, which Father does not do.

Mother testified that she thought Father was using B.C.C. to relay messages to her and make her look bad by requesting things that were not defined in the orders and things that she and Father should have handled directly. Mother also testified there had been times when Father did not show up to pick up B.C.C. at school and did not drop B.C.C. off for school, and Mother thought Father did not follow court orders "the way that they're intended[.]" Mother testified that she believed a parenting facilitator could help with these issues.

Mother recalled that, in his deposition, Father testified that he spanked B.C.C. with a belt, and Mother thought that was unreasonable. Mother also testified that

Father sometimes called B.C.C. late in the evening, near B.C.C.'s bedtime, and the calls made B.C.C. upset. Mother testified that she did not believe that Father has the parenting skills to take care of B.C.C. overnight because he lacked consistency with discipline, B.C.C. did not understand what is expected of him at Father's house, and B.C.C. needed structure and consistency that he did not get from Father. According to Mother, Father let B.C.C. stay up too late and watch movies not appropriate for B.C.C.'s age, and B.C.C. came back from visitation with Father "extremely tired[.]" According to Mother, since B.C.C.'s overnight visits with Father stopped, B.C.C. was more obedient and doing better overall, and having a schedule and consistency helped B.C.C.'s focus. Mother also testified that Father took "12 to 48 hours[]" to respond to questions in the Our Family Wizard app. Mother did not believe Father had been forthcoming because he did not tell her he had health insurance for B.C.C., she only learned that Father had health insurance for B.C.C. in August of 2020, but Father did not provide her with an insurance card, and Father did not provide the results of his own COVID test as requested. Mother also testified that on two occasions, Father left B.C.C. at school without notifying her, and Mother believed this occurred after September 2018.

Mother testified that Father took medication for ADHD but that she had never seen him be hyperactive in the eight years she has known him. She also testified that one of the reasons she had filed for a modification was that Father had hired someone

from Care.com to be "his stand-in" until he got off work, Father refused to let Mother talk with the person, and Father refused to give Mother information about the person he hired. Mother also stated that Father was sometimes late paying child support.

Mother denied that she had ever said she would "murder" Father. She agreed that Father had filed criminal charges against her for assault by threat, and that after a trial on those charges, she was found not guilty. Mother believed that Father was never scared of her, but he wanted to thwart her career path so she could not become a police officer.

Mother stated that she had gotten married about a week before the hearing. On cross-examination Mother agreed that she knew her husband had a DWI from 2015, was sentenced in 2018, and his probation ended in 2019. Mother testified that her husband has three children who live with their mother.

Testimony of Christy Mellen

Christy Mellen, a licensed professional counselor, testified that Father started seeing her in 2015 and resumed seeing her in July 2019. According to Mellen, Father was dealing with the stress of custody issues, being a new father, and wanting to avoid repeating the "dysfunction of his own family." Mellen testified that Father also sought help for coping skills, managing stress, and handling conflict, but that Father did not necessarily need coping skills in regard to B.C.C. From her perspective as his therapist, Mellen believed that Father had been doing as much as he could, Father

14

had presented as stable, and she did not have concerns about his emotional stability. Mellen did not believe that Father was as "fixated" on Mother as he used to be, and he was "really focused on just being able to be a good parent[.]" On cross-examination, Mellen agreed that Father had not talked with her about his behavior at exchanges, his parenting style, or his interaction with others in public.

Testimony of Father

Father testified that he told Mother he had health insurance for B.C.C. since 2018 and that he should not have to pay Mother for health insurance that he can provide. A letter dated September 25, 2020 was admitted into evidence that showed health insurance coverage for Father and B.C.C. with an effective date of January 20, 2019. Father testified he requested a copy of an insurance card for B.C.C. to give to Mother, but he had not provided one until just before the hearing. According to Father, in the eighteen-month period before the hearing, he had moved into an apartment where he and B.C.C. could have their own rooms, and he no longer lived with roommates. Father testified that he no longer needed someone from Care.com to pick up B.C.C. because he can do so himself. Father testified that he sent Mother an email on March 19, 2019 attempting to resolve their disagreements and Mother had not responded. Father agreed that at one point, Mother said she wanted to kill him, and he was notified around "[l]ate April, early May[]" of 2019 that he would be a witness at Mother's criminal trial for the charges Father filed against Mother.

15

He testified that going to the LIT police academy to try to keep Mother from getting a job in law enforcement was a mistake.

Father agreed that he drug-tested "dirty" for marijuana at the beginning of this case but that his most recent drug test was "clean" except for his prescription medication. Father testified that he was seeing counselor Christy Mellen to address the items outlined in Dr. Lucas's report to the court. He also agreed he had a substance abuse assessment done since the case began, and the assessment records were admitted into evidence which reflect an assessment that further treatment was not recommended because Father did not meet the criteria for a diagnosis of a substance use disorder.

Father testified that in his current employment with UPS, he is guaranteed twenty hours every week, but he works more than that because he picks up additional shifts when they are available. Father's payroll stub for the pay period ending August 29, 2020 was admitted into evidence, and it showed his year-to-date earnings (for eight months) as $45,146.08.

The Trial Court's Order

On October 16, 2020, the trial court signed an Order in Suit to Modify Parent-Child Relationship (the Order).[5] The trial court granted the modification, found that

---

[5] We only include those portions of the modification order relevant to our discussion.

the material allegations in the petition to modify were true, and found that the requested modification was in B.C.C.'s best interest. The Order named Mother as Joint Managing Conservator with the right to establish the primary residence of the child and ordered that she have the right to enroll B.C.C. in school. The Order granted Father possession and access to B.C.C. on Saturday 9 a.m. to 6 p.m. and Sunday 9 a.m. to 6 p.m. of the 1st and 3rd weekends and each Wednesday from 6 p.m. to 8 p.m.

The Order appointed a parenting facilitator and ordered the following regarding the facilitator's duties:

> IT IS ORDERED that the duties of [the] Parenting Facilitator are limited to the following:
> a. Identifying disputed issues;
> b. Reducing misunderstandings;
> c. Clarifying priorities;
> d. Exploring possibilities for problem solving;
> e. Developing methods of collaboration in parenting;
> f. Understanding parenting plans and reaching agreements about parenting issues to be included in the parenting plan;
> g. Complying with the court's order regarding conservatorship or possession of and access to the children;
> h. Implementing parenting plans;
> i. Obtaining training regarding problem solving, conflict management, and parenting skills; and
> j. Settling disputes regarding parenting issues and reaching a proposed joint resolution or statement of intent regarding those disputes.
> IT IS FURTHER ORDERED that the parenting facilitator shall assess [Father]'s visitation with the child to gradually increase over time as [Father] demonstrates the following:
> 1. Better decision making in regard to his behavior;

17

2. Ability to provide detailed information regarding his roommates and whether they are appropriate persons for the child to be around;
3. More effective coping skills and emotional stability; and
4. Improvement in the ability of [Father] and [Mother] to co-parent effectively.

IT IS ORDERED that the parenting facilitator shall notify the parties and the Court if [Father]'s visitation increases. Said increase in visitation shall commence within five (5) days of receipt of the Court Order.

The trial court also ordered Father to pay Mother monthly child support in the amount of $902.86 and retroactive child support in the amount of $2,888.76 for the increase in child support for the time period of April 1, 2020 to September 30, 2020.

Father filed a Motion for New Trial, which was overruled by operation of law. Father appealed the Order.

Parenting Facilitator

In his first issue on appeal, Father argues that the trial court abused its discretion in improperly delegating possession and access determinations to the parenting facilitator. According to Father, the Order included the trial court's directive which delegated to the parenting facilitator the authority to set the terms of possession and access, and the trial court "expanded the facilitator's duties to exceed what is allowed by statute, ordering that (1) the parenting facilitator shall assess [Father's] visitation with the child to gradually increase over time as [Father] demonstrates 'specific criteria' and (2) the facilitator is required to notify the parties

18

and the [trial court] if [Father]'s visitation increases by providing the [trial court] with an order."

Trial courts generally "must exercise their judicial power to decide disputed issues and not delegate the decision of questions within their jurisdiction." *Waters v. Waters*, No. 04-16-00690-CV, 2017 Tex. App. LEXIS 11531, at \*\*14-15 (Tex. App.—San Antonio Dec. 13, 2017, no pet.) (mem. op.) (citing *In re J.S.P.*, 278 S.W.3d 414, 422 (Tex. App.—San Antonio 2008, no pet.)). However, in certain circumstances, a court may appoint a neutral third party to help protect the best interest of the child and to minimize restrictions on a parent's right to possession of and access to a child. *See id.* The Texas Family Code provides that, in a suit affecting the parent-child relationship, the trial court may appoint a parenting facilitator if the court makes findings that

(1) the case is a high-conflict case or there is good cause shown for the appointment of a parenting facilitator and the appointment is in the best interest of any minor child in the suit; and
(2) the person appointed has the minimum qualifications required by Section 153.6101, as documented by the person.

Tex. Fam. Code Ann. § 153.6051(a), (b). The Family Code defines a "[p]arenting facilitator" as an impartial third party who performs any function described by section 153.6061 in a suit and who is appointed by the court to assist the parties in resolving parenting issues through non-confidential procedures and who has not

19

been appointed under another statute or rule of procedure. *Id.* § 153.601(3-a).

Section 153.6061 provides:

> (a) The court shall specify the duties of a parenting facilitator in the order appointing the parent facilitator. The duties of the parenting facilitator are limited to those matters described with regard to a parenting coordinator under Section 153.606(a), except that the parenting facilitator may also monitor compliance with court orders.
> (b) A parenting facilitator appointed under this subchapter shall comply with the standard of care applicable to the professional license held by the parenting facilitator in performing the parenting facilitator's duties.
> (c) The appointment of a parenting facilitator does not divest the court of:
>> (1) the exclusive jurisdiction to determine issues of conservatorship, support, and possession of and access to the child; and
>> (2) the authority to exercise management and control of the suit.
> (d) The parenting facilitator may not modify any order, judgment, or decree.
> (e) Meetings between the parenting facilitator and the parties may be informal and are not required to follow any specific procedures unless otherwise provided by this subchapter or the standards of practice of the professional license held by the parenting facilitator.

*Id.* § 153.6061. Section 153.606(a), referenced by section 153.6061, states that the duties of a parenting coordinator are limited to matters that will aid the parties in:

> (1) identifying disputed issues;
> (2) reducing misunderstandings;
> (3) clarifying priorities;
> (4) exploring possibilities for problem solving;
> (5) developing methods of collaboration in parenting;
> (6) understanding parenting plans and reaching agreements about parenting issues to be included in a parenting plan;
> (7) complying with the court's order regarding conservatorship or possession of and access to the child;
> (8) implementing parenting plans;

(9) obtaining training regarding problem solving, conflict management, and parenting skills; and

(10) settling disputes regarding parenting issues and reaching a proposed joint resolution or statement of intent regarding those disputes.

*Id.* § 153.606(a). The duties of the parenting facilitator are limited to those matters described for a parenting coordinator under Section 153.606(a), except that the parenting facilitator may also monitor compliance with court orders. *Id.* § 153.6061(a). A parenting facilitator "shall submit a written report to the court and to the parties as ordered by the court." *Id.* § 153.6081. The report may include a recommendation about how to settle disputes, but the report may not include recommendations regarding conservatorship of, possession of, or access to the child who is the subject of the suit. *Id.* §§ 153.6081, 153.6082(e).

Here, the challenged order states that "the duties of [] [the] Parenting Facilitator *are limited to* the following:"[6]

a. Identifying disputed issues;
b. Reducing misunderstandings;
c. Clarifying priorities;
d. Exploring possibilities for problem solving;
e. Developing methods of collaboration in parenting;
f. Understanding parenting plans and reaching agreements about parenting issues to be included in the parenting plan;
g. Complying with the court's order regarding conservatorship or possession of and access to the children;
h. Implementing parenting plans;
i. Obtaining training regarding problem solving, conflict management, and parenting skills; and

---

[6] Emphasis added.

j. Settling disputes regarding parenting issues and reaching a proposed joint resolution or statement of intent regarding those disputes.

The list of the facilitator's duties stated in the trial court's order is substantially the same as the authorized duties listed in section 153.606(a) and the duties incorporated by reference into section 153.6061(a). *See id.* §§ 153.606(a), 153.6061(a). The trial court's order states that "the parenting facilitator shall assess [Father]'s visitation" with B.C.C., "to gradually increase over time" as Father demonstrates certain listed improvements. This sentence does not state who shall order the increase in Father's visitation, nor does it state that the parenting facilitator shall be the person to decide or make a recommendation to increase Father's visitation. In the next paragraph, the order states that an "increase in visitation shall commence within five (5) days of receipt of the Court Order." After reviewing the entire modification order and considering the duties enumerated in the relevant statutory provisions, we conclude that the Order does not improperly delegate possession and access determinations to the facilitator. The trial court's order limits the facilitator's duties generally to facilitation, conflict resolution, and assessment consistent with sections 153.606(a) and 153.6061(a). *See id.* §§ 153.606(a), 153.6061(a). Therefore, we do not read the order as an improper delegation of authority to the parenting facilitator to increase

(or otherwise alter) Father's access to or possession of B.C.C.[7] We overrule Appellant's first issue.

Substantial and Material Change in Circumstances

In issue two, Father argues that the trial court abused its discretion in finding that a substantial and material change of conditions existed warranting modification of the prior SAPCR order. In issue three, Father argues that the trial court's award of current and retroactive child support was an abuse of discretion because Mother, when attempting to show a material and substantial change in circumstances, failed to introduce any evidence of the circumstances at the time of the initial order. We construe Appellant's arguments in these issues to challenge the legal sufficiency of the evidence to support the trial court's findings for a modification.

We review a trial court's modification order under an abuse of discretion standard of review. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *See In re A.E.M.S.*, No. 09-07-410-CV, 2008 Tex. App. LEXIS 7572, at *2 (Tex. App.—Beaumont Oct. 9, 2008, no pet.) (mem. op.). Under an abuse of discretion standard, the factual

---

[7] We note that a docket entry dated September 28, 2020, states that the parenting facilitator "can increase or decrease access as she sees fit depending on parties-must notify parties and court of any changes to access[.]" However, a docket entry cannot be used to contradict or prevail over a final judicial order. *See N-S-W Corp. v. Snell*, 561 S.W.2d 798, 799 (Tex. 1977).

sufficiency of the evidence is not an independent ground of error but is merely a factor in assessing whether the trial court abused its discretion. *In re A.E.D.*, No. 09-13-00555-CV, 2014 Tex. App. LEXIS 10587, at *7 (Tex. App.—Beaumont Sept. 4, 2014, pet. denied) (mem. op.). Because trial courts have wide discretion to determine the child's best interest in issues of custody and visitation, "[t]he trial court does not abuse its discretion if its order is supported by some evidence of a substantive and probative character." *Id.*; *see also In re H.M.W.*, No. 09-21-00047-CV, 2022 Tex. App. LEXIS 1634, at *20 (Tex. App.—Beaumont Mar. 10, 2022, no pet.) (mem. op.). "We review the entire record to determine whether the trial court's decision was arbitrary or unreasonable." *In re A.E.D.*, 2014 Tex. App. LEXIS 10587, at *7. There is no abuse of discretion when the trial court decides based on conflicting evidence, so long as some evidence supports the trial court's decision. *In re H.M.W.*, 2022 Tex. App. LEXIS 1634, at *20.

The factfinder "'is the sole arbiter of the witnesses' credibility and demeanor,'" and our review must defer to the trial court's factual determinations. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible. *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). When, as

24

here, the trial court does not issue separate findings of fact, we presume the trial court made all findings necessary to support its judgment. *See Worford*, 801 S.W.2d at 109.

A court that has continuing exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child. Tex. Fam. Code Ann. § 155.003(a). Section 156.101 of the Family Code sets out the grounds for modifying a conservatorship order:

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
> > (1) The circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
> > > (A) the date of the rendition of the order; or
> > > (B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based[.]

*Id.* § 156.101(a)(1); *In re A.E.M.*, No. 09-18-00288-CV, 2020 Tex. App. LEXIS 1439, at \*36 (Tex. App.—Beaumont Feb. 20, 2020, no pet.) (mem. op.). "'The change-in-circumstances requirement is a threshold issue for the trial court and is based on a policy of preventing constant re-litigation with respect to children.'" *In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at \*36 (quoting *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.)). Unlike termination of parental rights cases in which the statutory grounds for termination must be established by clear and convincing evidence, the standard of proof for a

conservatorship decision is preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Circumstantial evidence is as probative as direct evidence. *See Cavanaugh v. Davis*, 235 S.W.2d 972, 977 (Tex. 1951) (citing *Duke v. Houston Oil Co. of Tex.*, 128 S.W.2d 480, 485 (Tex. App.—Beaumont 1939, writ dism'd, judgm't cor.)); *see also In re S.C.*, No. 09-21-00325-CV, 2022 Tex. App. LEXIS 2263, at *39 (Tex. App.—Beaumont Apr. 7, 2022, no pet.) (mem. op.) (explaining a best interest determination may rely on direct or circumstantial evidence); *In re K.P.*, No. 09-13-00404-CV, 2014 Tex. App. LEXIS 9263, at *42 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (same). Determination of a substantial and material change is not controlled by a set standard of criteria; instead, it is fact specific. *In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at *37 (citing *Epps v. Deboise*, 537 S.W.3d 238, 243 (Tex. App.—Houston [1st Dist.] 2017, no pet.)).

For reviewing the best interest of the child, we apply a nonexhaustive list of factors known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals seeking

custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.*

The trial court, as the court with continuing jurisdiction, is presumed to have knowledge of the history of the case, including knowledge of its previous orders. *See In re A.M.*, 2019 Tex. App. LEXIS 7941, at \*\*46-47. The appellate record includes evidence of the previous order and developments after the previous order. Officer Kirk Smith testified that Father had sought police intervention in the exchange of B.C.C. between Mother and Father and that Father had filed a police report and wanted to file criminal charges against Mother. Jimmy LeBouef testified that Father had gone to the LIT police academy, where Mother was enrolled, to tell them about the criminal charges he filed against Mother and to try to get Mother kicked out of the academy. Mother also testified that she was found not guilty at the trial on the criminal charges Father filed against her, and her affidavit states that the trial was in May 2019. Mother testified that Father did not pick up or drop off B.C.C. at school as he was supposed to do under the previous order. She also testified that Father allowed B.C.C. to stay up too late and watch movies that she did not think were "age-appropriate." According to Mother, Father did not timely respond to messages over the Our Family Wizard app, and he failed to tell her he had health insurance coverage for B.C.C. until August 2020. Mother also testified that Father

27

had hired someone from Care.com and would not allow Mother to talk with the person he had hired. Mother stated that Father was sometimes late paying child support. In addition, Mother testified that she had recently gotten married. After Mother filed the Petition to Modify, Father had also tested positive for marijuana use.

Dr. Lucas testified that she evaluated Mother and Father as ordered by the trial court in 2019. Lucas testified that Father's test results reflected "some psychotic tendencies[]" and a tendency to act on his emotions without thinking through the consequences. Lucas also observed a session with Father and B.C.C. on September 17, 2019, during which Father lifted his shirt and showed B.C.C. his belt, which Lucas believed was a threat to spank B.C.C. when the child did not answer questions as Father wanted. Lucas also recommended that Father undergo a medication evaluation with a psychiatrist.

Father testified that he no longer lived with roommates and no longer needed the person he hired from Care.com. He agreed that he drug-tested "dirty" for marijuana at the beginning of the modification. He also testified that, in his job with UPS, he is guaranteed at least twenty hours per week but that he often picks up additional shifts. One of his payroll stubs was admitted into evidence, which showed year-to-date earnings through the end of August of $45,146.08.

Deferring to the trial court's assessment of the credibility and weight of the evidence, we conclude that the record includes sufficient evidence from which the trial court could have reasonably concluded a material and substantial change of circumstances had occurred since the date of the order to be modified and also that the modification was in B.C.C.'s best interest. *See* Tex. Fam. Code Ann. § 156.101(a)(1); *Holley*, 544 S.W.2d at 371-72. *See In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at **36-37. Dr. Lucas testified that she had concerns about Father's parenting skills, decision-making, and "psychotic tendencies[.]" *See Holley*, 544 S.W.2d at 371-72; *In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at **36-37. Lucas testified that Mother and Father were "not communicating and coordinating anything, which [] is part of the reason why [] they need parenting facilitation." Lucas agreed that she recommended that Father's visitation increase as Father shows improvement in interactions, consistency, parenting, and negative drug test results. We cannot say the trial court abused its discretion entering the modified order appointing a parenting facilitator.

As to his issue complaining about the child support, Father argues the trial court abused its discretion in making its award because Mother "failed to introduce any evidence of the circumstances at the time of the initial order." Appellee also contends that "[Mother] failed to properly give notice to [Father] and the court of her intention to obtain child support as well as an increase in her medical support for

29

[B.C.C.]." He challenges the award of current and retroactive support, but he has not specified how the amount awarded is incorrect nor does he specify how the award should have been calculated. The previous order that Mother sought to modify was entered in September 2018 and it ordered Father to pay Mother $93 per month as "cash medical support for reimbursement of health insurance premiums, as child support," and that order stated that "[a]ll other terms of the prior orders not specifically modified in this order shall remain in full force and effect." In the Order entered in 2016, the trial court had ordered Father to pay $328.40 in monthly child support.

In her Second Amended Petition for Modification which was the live pleading at the time of this modification hearing, Mother stated that "the circumstances of the child or a person affected by the order have materially and substantially changed" and "[t]he support payments previously ordered are not in substantial compliance with the guidelines in chapter 154 of the Texas Family Code," and "Petitioner requests that any increase be made retroactive to the earlier of the time of service of citation on Respondent or the appearance of Respondent in this modification action." Although the support order to be modified was not admitted into evidence at the hearing, the trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that the trial court judicially knows. *See In re A.M.*, 2019 Tex. App. LEXIS 7941, at

30

**46-47. The trial court is presumed to know the content of its prior orders in this case. *See In re Marriage of Comstock*, 639 S.W.3d 118, 132 (Tex. App.—Houston [1st Dist.] 2021, no pet.). The trial court could have considered Father's testimony that he worked at least twenty hours a week and that he said he picked up additional shifts, in addition to Father's pay stub that showed his 2020 year-to-date earnings for eight months. The trial court stated on the record that it was "going to follow the standard order." The record does not reflect that Father produced any evidence to rebut Mother's allegation that the prior child support award was not in line with the statutory guidelines, nor did Father challenge the evidence of his current earnings. Father did not challenge Mother's allegation that the prior amount was insufficient according to the guidelines.[8]

To the extent Father intended to challenge the specific terms of possession or visitation or the specific amount of the child support ordered, he failed to make those

---

[8] At the hearing, Father produced a pay stub that reflected year-to-date gross earnings of $45,146.08 as of August 29, 2020. Mother's trial attorney argued at trial that using the pay stub information correlated to approximately $67,074.28 a year, or $5,589.52 a month gross, based on the pay stub. Father's trial attorney argued that based on Father's current income, and the child support guidelines for one child, he believed the child support payment should be $847.97 a month, absent the insurance reimbursement. The Court indicated the Court was "going to follow the standard order[]" and order retro-active payment. Using the pay stub and then applying a full year's calculation to the monthly gross income and applying the statutory twenty percent calculation of Father's net monthly income, the $902.86 monthly child support payment ordered by the trial court is within the suggested standard statutory guideline. *See* Tex. Fam. Code Ann. §§ 154.061, 154.125(b).

arguments in his briefs on appeal or at the trial court (where he was represented by counsel). Therefore, he has waived any such complaints. *See* Tex. R. App. P. 33.1, 38.1(f), (i); *In re G.X.H.*, 627 S.W.3d 288, 300 (Tex. 2021) (failure to raise an issue to the trial court waives the issue for appeal). After reviewing the record on appeal, we conclude that the record provides sufficient evidence to support the amount of child support and the retroactive award of medical support. We overrule Appellant's second and third issues.

Having overruled all of Appellant's issues, we affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on October 10, 2022
Opinion Delivered December 1, 2022

Before Golemon, C.J., Horton and Johnson, JJ.